# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**LAKE BUENA VISTA VACATION RESORT, L.C.,**

**Plaintiff,**

**v.**                                                  **Case No:  6:12-cv-1680-Orl-31DAB**

**GOTHAM INSURANCE COMPANY,**

**Defendant.**

_____

# ORDER

This matter comes before the Court without a hearing on the Motion for Summary Judgment (Doc. 63) filed by the Defendant, Gotham Insurance Company ("Gotham"), the response in opposition (Doc. 78) filed by the Plaintiff, Lake Buena Vista Vacation Resort, L.C. ("LBV"), and the reply (Doc. 87) filed by Gotham.

## I.    Background[1]

In early 2007, Gotham issued a "Title Agent's Professional Liability Insurance Policy" (henceforth, the "Policy") to Coastal Title Services, Inc. ("Coastal").  (Doc. 2-1 at 1).  Under the terms of the Policy, Gotham agreed to pay, in pertinent part:

> all sums which [Coastal] shall become legally obligated to pay as damages because of
>
> A.    Any act, error or omission of [Coastal] in rendering or failing to render professional services for others as a:
>
> 1.    title insurance agent, title abstractor, title searcher, escrow agent or closing agent

---

[1] Except where noted, the following information is undisputed.

…

> while there is in effect a valid agent or underwriting agreement between [Coastal] and [the sponsoring title insurance company].

(Doc. 2-1 at 2).  In pertinent part, the Policy defined "professional services" as

> those services necessary to the conduct of [Coastal's] business activities as a title insurance agent, title abstractor, title searcher, escrow agent or closing agent.  Professional services shall include the following:
>
> 1.      The sale and/or servicing of products made available by the title insurance company
>
> 2.      Providing:
>
> a.      advice, consultation, or administration – other than third party claims administration – for products made available by a title insurance company; and
>
> b.      services, including those of an escrow agent … whether or not a separate fee is charged
>
> …
>
> 3.      Provided that professional services shall *not* include services in a capacity as an accountant, attorney, actuary, life insurance agent, accident/health insurance agent, property/casualty insurance agent, real estate agent or real estate broker.

(Doc. 2-1 at 5-6).

The Policy provided a type of coverage known as "Claims Made and Reported".  (Doc. 2-1 at 2).  With some exceptions not relevant to the instant case, coverage was limited to acts, errors, and omissions that occurred "[d]uring the Policy Period, and then only if [a] claim is first made against [Coastal] during the Policy Period and is reported to [Gotham] in writing during the Policy Period."  (Doc. 2-1 at 3).  The Policy Period was to run from March 1, 2007 to March 1, 2008. (Doc. 2-1 at 1).

Coastal financed the Policy through Premium Assignment Corporation ("PAC").  PAC paid Gotham the entire annual premium while Coastal was to make monthly payments to PAC. PAC was given a power of attorney that allowed it to cancel the Policy if it did not receive timely payments from Coastal.

LBV and Coastal were working together to develop a condominium project known as the San Marco Resort.  One of the principals of Coastal, Ira Hatch ("Hatch"), was an attorney. Hatch's firm, Hatch & Doty, P.A. ("Hatch & Doty") worked with LBV to develop the San Marco Resort.  Among other responsibilities on the project, Coastal collected deposits from prospective purchasers of San Marco Resort condominiums, to be held in escrow.  At some point, a number of those deposits were stolen.[2]  Subsequently, the San Marco Resort project collapsed.[3]

On October 10, 2007, Gotham received a notice of cancellation from PAC[4], informing the insurer that the Policy had been cancelled for Coastal's failure to make a premium payment to PAC that had been due on September 1, 2007.  (Doc. 78-6 at 1).  The notice listed a "cancellation date" of October 3, 2007, but the body of the notice provided that the cancellation would be effective "one day after the above-captioned date, at the hour indicated in the policy as the effective time." (Doc. 78-6 at 1).  The Policy had an effective time of 12:01 a.m.  (Doc. 2-1 at 1).

Also on October 10, 2007, an agent of Gotham – Mutual Marine Office, Inc. ("Mutual Marine") – received a note from Coastal.  The note, dated October 4, 2007, read as follows:

> Gentlemen:
>
> I am writing to inform you of a possible claim against the [Policy] arising as a result of alleged negligence and/or defalcation of monies

---

[2] The record is not clear as to the amount of deposits held by Coastal in relation to the San Marco Resort project, or the amount of deposits stolen.

[3] In 2010, Hatch pled no contest to racketeering in connection with the thefts from Coastal's escrow accounts, for which he is now serving a 30-year prison term.  (Doc. 63 at 5).

[4] It is not clear from the record what date PAC sent the cancellation notice.

by certain employees and agents of the insured.  If you require additional information, please feel free to contact me.

Very truly yours,

Ira C. Hatch, Jr.

Vice President

(Doc. 8-5).  Mutual Marine forwarded the note – henceforth, the "Hatch Letter" -- to Gotham, which contacted Hatch by phone on October 16, 2007 for additional information.  Hatch declined to provide any additional details, citing an ongoing criminal investigation.  (Doc. 63-7).

On October 18, 2007, Gotham sent a letter to Hatch, stating that based on the Hatch Letter and the October 16, 2007 phone conversation with him, Gotham would not defend or indemnify Coastal because of two provisions of the Policy that excluded coverage for "intentional misappropriation of funds".[5]  (Doc. 78-2 at 1).  The letter did not refer to the cancellation of the Policy or cite cancellation as a basis for refusing to defend or indemnify.

On June 30, 2008, Andrew and Susan Mathew filed suit (henceforth, the "Mathew Suit") in state court against Coastal, Hatch and LBV.  (Doc. 81-4).  Asserting claims for breach of contract, conspiracy, and unjust enrichment, the Mathews sought the return of two deposits, totaling approximately $27,000, that they had made in connection with the San Marco Resort project.  (Doc. 81-4).

On November 5, 2008, LBV filed cross-claims against Coastal and Hatch in the Mathew Suit.  (Doc. 8-1 at 1, 6).  LBV asserted a cross-claim for breach of fiduciary duty against Hatch,

---

[5] The Policy provisions cited by Gotham excluded coverage for damages based upon or arising out of "[a]ny act, error, omission or personal injury committed with dishonest, fraudulent, criminal or malicious purpose or intent; or damages which are expected or intended by the insured" and for "conversion, misappropriation, commingling or defalcation of funds or other property."  (Doc. 8-7 at 1)

and a cross-claim for breach of contract against Coastal.[6]  (Doc. 8-1 at 11-15).  In the background section of the cross-claim, LBV made numerous allegations about conflicts of interest and ethical breaches on the part of Hatch (both individually and in his capacity as attorney for LBV), but only made two allegations in regard to Coastal:  LBV alleged that Coastal (along with Hatch) "intentionally and fraudulently defalcated, converted, and/or misappropriated … deposits from [Coastal's] escrow trust account"  (Doc. 8-1 at 9-10) and that Coastal "never returned" the deposits (Doc. 8-1 at 10).  In the count asserting a breach of contract claim, LBV reiterated the allegation that Coastal "wrongfully and illegally defalcated, misappropriated, and converted to its own use or the use of Hatch all of the escrow deposits" in violation of the relevant escrow agreements.  (Doc. 8-1 at 15).  On or about September 30, 2010, LBV served a subpoena on Gotham in the Mathew Suit, seeking documents relating to the Policy and to theft of escrow monies by Coastal and Hatch.  (Doc. 61-6 at 3-4).

Coastal never responded to LBV's cross-claim.  On September 21, 2011, the state court entered a default judgment (Doc. 2-1 at 58-60) against Coastal and in favor of LBV on the breach of contract cross-claim.  The default judgment awarded LBV $15.6 million in damages and $5.2 million in pre-judgment interest, as well as all of Coastal's property, including any rights Coastal might have to recover under the Policy.  (Doc. 2-1 at 59).  The default judgment did not include any factual findings.

On October 8, 2012, LBV filed the instant suit in state court.[7]  (Doc. 2).  Gotham removed the case to this court on November 8, 2012.  (Doc. 1).  In the instant suit, LBV stands in the shoes

---

[6] LBV also filed third-party claims against Hatch & Doty, Lawyers Title Insurance Corporation, and Attorneys' Title Insurance Fund, Inc.  (Doc. 8-1 at 16).

[7] Coastal was originally a party to this suit, with the second of the two counts in the complaint seeking declaratory relief in regard to it, but Coastal was dismissed pursuant to a stipulation of the parties on December 11, 2102.  (Doc. 17).

of Coastal and seeks to recover under the Policy for the judgment LBV obtained against Coastal in the Mathew Suit.[8]  (Doc. 2 at 11-13).  In the instant complaint, LBV characterizes the judgment as having been obtained against Coastal, not because of Hatch's theft, but because of alleged failures by Coastal to "properly advise [LBV] regarding the proper terms" of the escrow agreements and similar documents, failing to supervise Hatch, and "failing to advise and warn [LBV] of the risks inherent in permitting Coastal Title to hold such escrow monies."  (Doc. 2 at 3).

On April 30, 2013, LBV returned to state court and, on an *ex parte* basis, obtained an amended default judgment in the Mathew Suit.  (Doc. 47-1).  In contrast to the original default judgment, which did not include any factual findings, and to LBV's cross-claim, which only alleged that Coastal stole deposits from escrow and failed to return them, the amended default judgment included two pages of "Findings" to the effect that Coastal had been negligent in the rendering of professional services.   (Doc. 47-1 at 2-3).   For example, the amended default judgment contains a "finding" that Coastal negligently failed to supervise Hatch (Doc. 47-1 at 2) and another that Coastal had "serious conflicts of interest" and "breached [its] fiduciary duties" to LBV, causing Coastal to fail to provide "appropriate protection to [LBV] through the proper drafting of the escrow and sale agreements."  (Doc. 47-1 at 3).  The amended default judgment also contains a finding that these misdeeds (rather than the thefts) caused all of the $20.8 million in damages and interest that were awarded to LBV.  (Doc. 47-1 at 3).

---

[8] The amount sought by LBV in this suit is not clear, but the Policy had limits of $500,000 per claim and $1,000,000 in the aggregate.  (Doc. 2-1 at 1).

## II.     Legal Standard

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The Court is not, however, required to

accept all of the non-movant's factual characterizations and legal arguments.  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

## III.    Analysis

Gotham contends that there is no coverage under the Policy for LBV's claim against Coastal because the Policy was cancelled on October 3, 2007, because Coastal did not provide notice of the claim before that date, and, in the alternative, because various coverage exclusions apply.  LBV offers a host of arguments to rebut these contentions.

### A.    Cancellation Date

LBV argues that Coastal provided the required notice of a claim because the Policy was still in effect when the Hatch Letter was sent.  LBV makes several arguments that the Policy was not cancelled on October 3, 2007.  First, LBV contends that the Policy could not have been cancelled until October 10, 2007, when Gotham received the notice of cancellation from PAC.  In support of this point, LBV cites *Southern Group Indem., Inc. v. Cullen*, 831 So. 2d 681 (Fla. 4th DCA 2002).  In that case, the court found that a policy provision that required "giving [the insurer] advance written notice of the date cancellation is to take effect" prevented a cancellation by the premium financing company from becoming effective until the insurer actually received the cancellation notice.  *Id.* at 682.  Thus, where the premium financing company sent a letter to the insurer on January 5, announcing a cancellation effective January 5, the cancellation did not take effect until January 9, the date when the insurer received the letter.  *Id.*

The Policy has a provision permitting cancellation "by mailing to [Gotham] written notice stating when <u>thereafter</u> cancellation shall be effective."  (Doc. 78-4 at 14) (emphasis added).  PAC sent a cancellation notice to Gotham specifying an October 3, 2007 cancellation date, but Gotham did not receive the cancellation notice until October 10, 2007.  (Doc. 78-6 at 1).  Gotham argues

that any advance notice requirement was satisfied by an earlier notice that PAC sent to Gotham, specifying a cancellation date of September 26, 2007.  (Doc. 63-3).  However, this earlier notice was notice of an intent to cancel, not a cancellation notice.  The notice of intent to cancel did not itself purport to cancel the Policy, and therefore it did not satisfy the requirement that cancellation be accomplished by way of "written notice stating when thereafter cancellation shall be effective".  Thus, as in *Cullen*, the Policy could not have been cancelled before October 10, 2007.[9]

      **B.**    **Claim reporting**

The Policy only provided coverage for claims "first made against [Coastal] during the Policy Period and … reported to [Gotham] in writing during the Policy Period."  (Doc. 2-1 at 3).  It is undisputed that Gotham's agent received the Hatch Letter on October 10, 2007, the earliest day the cancellation could have taken effect.  Therefore, the Hatch Letter was received by Gotham during the Policy Period.  The question then becomes whether the following constituted notice of the claim that resulted in the judgment against Coastal (i.e., LBV's cross-claim in the Mathew Suit):

> Gentlemen:
>
> I am writing to inform you of a possible claim against the [Policy] arising as a result of alleged negligence and/or defalcation of monies by certain employees and agents of the insured.  If you require additional information, please feel free to contact me.
>
> Very truly yours,
>
> Ira C. Hatch, Jr.

---

[9] LBV makes two other date-of-cancellation arguments, one in favor of an October 5, 2007 cancellation date and one in favor of a November 2007 cancellation date.  The argument in favor of the October 5, 2007 cancellation date is mooted based on the finding that the Policy could not have been cancelled prior to October 10, 2007.  Because the Hatch Letter was received by Gotham on October 10, 2007, the Court need not address the argument that cancellation occurred in November 2007.  LBV has not argued that any notice other than the Hatch Letter was provided to Gotham prior to November 2007.

Vice President

The Hatch Letter falls woefully short of providing notice of LBV's cross-claim.  Among other failings, the Hatch Letter does not report an actual claim; it reports a "possible claim."  It does not identify LBV, the Mathews or anyone else as the entity or individual who might make a claim against Coastal.  It does not even associate the San Marco Resort project with the potential claim.[10]  It does not describe the amount of money at issue or, except in the vaguest possible terms, describe the circumstances giving rise to the potential claim.[11]  Moreover, there is no evidence in the record that Hatch even knew by October 4, 2007 – the date of the Hatch Letter -- that LBV intended to pursue Coastal in connection with the failure of the San Marco Resort project.  Even assuming Hatch knew this, however, the Hatch Letter did not provide the required notice to Gotham.

The Policy does not define the term "claim".  Because of this, LBV argues that the following definition of "claim" should be applied here:  "The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional."  *Black's Law Dictionary* (9th ed. 2009).  But even assuming *arguendo* that this definition should be applied here, the Hatch Letter did not report that anyone (or any company) was asserting a conditional or

---

[10] Nothing in the record suggests that the thefts at Coastal were limited to deposits held in connection with the San Marco Resort.

[11] The Policy also provided, in a section titled "Notice of Circumstances," that if Gotham received written notice during the policy period of any act, error, or omission that could reasonably be expected to give rise to a claim, any claim that subsequently arose from that act, error or omission would be treated as a claim made during the policy period.  (Doc. 2-1 at 8).  In the alternative to its argument that the Hatch Letter provided notice of a claim, LBV argues that the Hatch Letter provided sufficient notice of circumstances so that the LBV cross-claim must be treated as a claim made during the policy period.  However, the utter absence of any description of the circumstances in the Hatch Letter is also fatal to this argument.  The Notice of Circumstances section of the Policy required a description of the act, error, or omission, notice of the date that the act, error or omission occurred, a summary of the facts, the alleged damages, and the names of the claimants, as well as other information.  (Doc. 2-1 at 8-9).  The Hatch Letter contained none of this information.

provisional right to payment.  Rather, the Hatch Letter reported that such a claim might be asserted at some point in the future.  And the Hatch Letter certainly did not suggest that LBV was the one that might assert such a claim.  Even with LBV's proposed definition of "claim," the Hatch Letter did not satisfy Coastal's reporting obligation so as to bring LBV's cross-claim within the coverage provided by the Policy.

LBV also argues that Gotham received notice of the Mathew Suit and LBV's cross-claim in time to defend Coastal because LBV served a subpoena for deposition duces tecum on Gotham on September 30, 2010.  (The initial default judgment was entered against Coastal on LBV's cross-claim in September 2011).  Even assuming that the subpoena did provide the requisite notice, which Gotham denies, it was received years outside the policy period and therefore could not bring LBV's cross-claim within the coverage provided by the Policy.

**C.      Equitable Estoppel**

LBV argues that Gotham is estopped from arguing that the Hatch Letter was not a valid report of a claim because its October 18, 2007 response to the Hatch Letter referred to "this claim," and because Gotham assigned a claim number in response to the Hatch Letter.

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which perhaps have otherwise existed, either of property or of contract, or of remedy, as against another person, who has in good faith relied upon such conduct and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, or of contract or of remedy."
>
> The doctrine of estoppel is applicable in all cases where one, by word, act or conduct, willfully caused another to believe in the existence of a certain state of things, and thereby induces him to act on this belief injuriously to himself, or to alter his own previous condition to his injury.

*State ex rel. Watson v. Gray*, 48 So.2d 84, 87–88 (Fla.1950) (quoting 3 Pomeroy's Equity Jurisprudence § 804 (5th ed.1941)).  LBV has provided no evidence (or even an argument) that Coastal changed its position in any way in response to Gotham's use of the term "this claim" or assigning of a claim number in response to the Hatch Letter.  Accordingly, equitable estoppel cannot apply here.

### D.   Statutory Compliance

LBV also argues that Gotham cannot assert most of the defenses it is attempting to assert in this action because it failed to comply with Florida law governing claims administration by insurers.  In particular, LBV argues that Gotham did not comply with Section 627.426, Florida Statutes, which provides in pertinent part that

> 2.  A liability insurer shall not be permitted to deny coverage based on a particular coverage defense unless:
>
>> (a)  Within 30 days after the liability insurer knew or should have known of the coverage defense, written notice of reservation of rights to assert a coverage defense is given to the named insured by registered or certified mail sent to the last known address of the insured or by hand delivery.

Fla. Stat. § 627.426(2)(a).  LBV points out that, in Gotham's October 18, 2007 response to the Hatch Letter (henceforth, the "Response"), the only bases cited for refusing to defend or indemnify Coastal were two exclusions related to misappropriation of funds.  (Doc. 78-2 at 1).  Based on this, LBV argues that Gotham cannot raise any other coverage defenses.  However, this argument presumes that the Response related to LBV's cross-claim against Coastal.  As discussed above, Gotham had not even received notice of the LBV cross-claim on October 18, 2007.  Therefore, in regard to LBV's cross-claim, Fla. Stat. § 627.426(2)(a) would not apply so as limit Gotham's coverage defenses to those identified in the October 18, 2007 response.  Similarly, LBV's argument assumes that as of October 18, 2007, Gotham knew or should have known of all

of the coverage defenses it might be able to assert to LBV's cross-claim.  Because Gotham had not even received notice of the cross-claim by October 18, 2007, Fla. Stat. § 627.426(2)(a) would not apply so as to limit LBV's defenses to those identified in the Response.

### E.     Futility

In the alternative, LBV argues that, given Gotham's denial of coverage in response to the Hatch Letter, Coastal was not required to take the "utterly futile act of notifying Gotham of any subsequent legal proceedings initiated against Coastal," such as the Mathew Suit or LBV's cross-claim.  (Doc. 78 at 12).  This would only be true if the Hatch Letter notified Gotham of LBV's cross-claim – or, at least, a claim with identical factual underpinnings to the one reported in the Hatch Letter -- so as to make denial of coverage a foregone conclusion.  *See*, *e.g.*, *Hannover Ins. Co. v. Dolly Trans Freight, Inc.*, 2006 WL 3842206 (M.D.Fla. 2006) (finding insured excused from reporting law suit arising from accident where insured had reported accident and insurer had "clearly and unequivocally" denied coverage on grounds that would also have precluded coverage in regard to the suit).  Here, the Hatch Letter did not provide notice of *any* claim, much less LBV's cross-claim, so it cannot be said that a denial of coverage in regard to what was reported in the Hatch Letter would result in a denial of coverage for LBV's cross-claim.  This is especially so given that Gotham's denial of coverage in the Response was based on exclusions relating to misappropriation and dishonesty (Doc. 8-7 at 1), whereas LBV contends that its cross-claim against Coastal in the Mathew Suit was based on professional negligence, not misappropriation or dishonesty (Doc. 78 at 15).

### F.     Admissibility

Some of the documents upon which Gotham relies in connection with the instant motion – such as the notice of cancellation sent by PAC to Gotham -- have not been authenticated.  LBV

argues that without authentication, the documents are not admissible in evidence and therefore Gotham should not be permitted to rely on them.  The Federal Rule of Civil Procedure governing summary judgment provides that a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed.R.Civ.P. 56(c)(2).  Thus, for purposes of summary judgment LBV cannot properly object that the documents are not admissible; the only permissible objection would be that the documents cannot be made admissible.  However, LBV does not challenge the documents' authenticity, only their lack of authentication, which is insufficient.  For its part, Gotham argues that the documents fall within the business records exception to the hearsay rule and, at least in regard to the PAC documents, has produced an affidavit from a vice president of PAC as to their authenticity.  (Doc. 87-2).  LBV's objection has no merit.

### G.      Duty to Defend

LBV argues that Gotham had a duty to defend Coastal in the Mathew Suit because the allegations of LBV's cross-claim "fairly place at issue [Coastal]'s negligent acts, which fall within the Policy's 'professional liability' coverage."  (Doc. 78 at 15).  Because the Court has already found that Coastal failed to report LBV's cross-claim to Gotham during the policy period, there was no coverage for the cross-claim -- and therefore no duty to defend -- regardless of what LBV alleged.  Even if this were not the case, LBV has failed to support this argument by quoting the allegations from the cross-claim that, in LBV's opinion, put Coastal's negligence at issue.  The Court's review of those allegations reveals no such allegations of negligence; to the contrary, in the cross-claim LBV accuses Coastal of having "intentionally and fraudulently defalcated, converted, and/or misappropriated" deposits from its escrow account.  (Doc. 8-1 at 9).

**H.     Attorney Services**

The definition of "professional services" covered by the Policy specifically excludes services in a capacity as an attorney (Doc. 78-4 at 6), and Exclusion XV of the Policy bars coverage for damages resulting from attorney services (Doc. 78-4 at 10).  LBV argues that neither of these restrictions apply because, although Hatch was an attorney, Coastal never provided attorney services.   The Complaint in this case, however, is shot through with allegations that Coastal, through Hatch, provided legal services to LBV.  For example:

> 17.     Ira Hatch, as an attorney and Coastal Title officer, advised [LBV] to enter escrow agreements with Coastal Title and to name Coastal Title as the escrow agent in reservation agreements and purchase contracts.
>
> 18.     Ira Hatch, however, acting within his scope of authority and on behalf of Coastal Title, fell far below the standard of care required of him, and negligently failed to properly draft such documents so as to adequately protect [LBV], including but not limited to failing to identify in the Reservation Agreements and Purchase Agreements the particular entity that would issue title insurance and the entity that would underwrite that insurance for the respective condominium units to be sold.
>
> …
>
> 21.     Based upon Ira Hatch's advice to [LBV] as an attorney and an authorized Coastal Title officer, LBV entered Reservation Agreements for 232 units.  Hatch, acting as an authorized officer of Coastal Title with a conflict of interest due to his dual representation of [LBV] and as business consultant to [LBV], included in the Reservation Agreements that each buyer would deposit $15,000.00 to be held in escrow by Coastal Title.
>
> …
>
> 23.     Based upon Ira Hatch's advice as an attorney and authorized Coastal Title officer [LBV] also entered Purchase Agreements for 13 condominium units.   Ira Hatch included in the Purchase Agreements that each buyer would deposit a specified amount to be held in escrow by Coastal Title.

(Doc. 2 at 5). After the thefts were revealed, LBV sued two title insurers, seeking to hold them liable under Fla. Stat. § 627.792 for Coastal's theft of deposits being held under the Reservation Agreements and Purchase Agreements. However, those agreements did not specify that Coastal was holding the deposits as a title agent, and therefore LBV could not collect from the title insurers under the statute. (Doc. 2 at 10). Moreover, two of the principals of LBV (and its Rule 30(b)(6) representatives) – Pablo Marulanda and Carlos Marulanda –testified repeatedly that Coastal (rather than Hatch & Doty) performed legal services for LBV and drafted the Reservation Agreements and Purchase Agreements.[12] Again, LBV's argument has no merit.

### I.    Other Exclusions

Gotham argues that several other exclusions also bar coverage for LBV's cross-claim: Exclusion I bars coverage for acts, errors, or omissions committed with dishonest, fraudulent, criminal or malicious purpose (Doc. 78-4 at 9); exclusion V bars coverage for damages from conversion, misappropriation, commingling or defalcation of funds (Doc. 78-4 at 10); exclusion VII provides that the Policy does not apply to the breach of any express contract (other than those regarding the state of a title)[13] (Doc. 78-4 at 10); and exclusion XXV bars coverage for any willful or intentional failure by Coastal or Coastal employees to comply with escrow instructions (Doc. 78-4 at 11). LBV seeks to avoid these exclusions by arguing that it is now attempting to collect for damages caused by Coastal's failure to supervise Hatch, its breach of fiduciary duty, and its failure to advise LBV of the thefts, not the thefts themselves or any breach of contract. (Doc. 78 at 18). However, under Florida law, where the application of one or more policy exclusions applies

---

[12] The Marulandas have subsequently filed "errata sheets" that, without credible explanation, attempt to transform all of their testimony that Coastal performed legal services into testimony that Coastal did not perform legal services. Gotham's motion to strike these errata sheets (Doc. 90) has not yet been ruled on, as the deadline for a response has not yet passed.
[13] As noted above, the claim asserted against Coastal in the cross-claim was styled as one for breach of contract.

to the face of a complaint, no duty to defend exists, even if the complaint alleges facts that otherwise would give rise to a covered claim.  *See, e.g.*, *Chicago Title Ins. Co. v. Northland Ins. Co.*, 31 So.3d 214, 216 (Fla. DCA 2010) (stating that "semantics cannot avoid the obvious").  The theft of the escrow funds was the core of the allegations set forth in the cross-claim, despite LBV's current effort to reinterpret that document.  The exclusions therefore apply.

### J.     Amended Final Judgment and *Coblentz*

LBV contends that Gotham is prohibited from contesting the factual findings incorporated into the amended final judgment in the Mathew Suit.  LBV primarily relies upon *Coblentz v. American Sur. Co. of New York*, 416 F.2d 1059 (5th Cir. 1969), in which the court, applying Florida law, stated that an insurer that wrongfully declined to defend its insured was barred from challenging a judgment entered against its insured on the grounds that the judgment did not obligate the insured to pay damages:[14]

> Where either an indemnitor or liability insuror has notice of a proceeding against his indemnitee or insured, and is afforded an opportunity to appear and defend, a judgment rendered against the indemnitee or insured, in the absence of fraud or collusion, is conclusive against the indemnitor or insuror as to all *material matters* determined therein.

(*Id.* at 1062-63) (emphasis added).

For numerous reasons, *Coblentz* is inapplicable here.  First, as detailed above, Gotham cannot be said to have declined to defend the cross-claim, as it did not receive notice of the cross-claim as required by the Policy.  In addition, even if Gotham had declined to defend the cross-claim, it would not have acted wrongfully, as the Policy did not provide coverage for the acts

---

[14] The policy at issue in *Coblentz* provided that the insurer would pay "on behalf of the insured all sums which the insured shall  become legally obligated to pay in damages."  *Id.* at 1062.  However, the consent judgment entered between the insured and the plaintiff in the underlying case provided that it could only be paid from the insurance policy.  *Id.*  Since the damages could only be paid from the policy, the insurer sought to argue that the insured was not legally obligated to pay them and therefore the policy did not provide coverage.

described in the cross-claim.[15]   Finally, even if both of those preconditions had been met, the entirely gratuitous factual findings contained in the amended final judgment here would not have been entitled to the same deference as the challenged passage in *Coblentz*.   Those findings, inserted by way of an *ex parte* proceeding into an existing default judgment, were not at all material to the judgment. *See also Baum v. Pines Realty, Inc.*, 164 So.2d 517, 522 (Fla.Dist.Ct.App.1964) ("The law is clear that a default judgment conclusively establishes between the parties, so far as subsequent proceedings on a different cause of action are concerned, *the truth of all material allegations contained in the complaint in the first action and every fact necessary to uphold the default judgment*.")[16] (emphasis added).

### IV.     Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 63) filed by the Defendant, Gotham Insurance Company, is **GRANTED**.   All other pending motions are **DENIED** as moot, and the Clerk is **DIRECTED** to close the file.

**DONE** and **ORDERED** in Orlando, Florida on October 7, 2013.

_____
**GREGORY A. PRESNELL**
**UNITED STATES DISTRICT JUDGE**

---

[15] Under Florida law, an insurer's duty to defend is determined solely by the allegations as pled in the complaint—not by the actual facts of the case. *Higgins v. State Farm Fire and Cas. Co.*, 894 So. 2d 5, 10 (Fla. 2004)

[16] LBV also argues that the judge in the *Mathew* Suit has ruled that *Coblentz* applies, and that this Court has held that the instant suit arises from the amended final judgment.  Neither of these arguments is helpful to LBV.  To whatever extent Judge Egan may have held that *Coblentz* applied to the case before him – and it is not clear that he so held – that holding has no impact on this case.  And this Court held that the breach of contract claim in the instant case "arose from" the amended final judgment only insofar as that judgment gave LBV the right to attempt to recover under the Policy.  (Doc. 66 at 2).

Copies furnished to:

Counsel of Record
Unrepresented Parties